IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| PAUL M. EMMER, | |
| Plaintiff, | CIVIL ACTION FILE |
| v. | NO. _____ |
| WABII BRANDING INC.; JEREMY SHANE RICH; GRANT GILLIARD; ROBERT KERTON; AND EDWARD SCOTT, | Jury Trial Demanded |
| Defendants. | |

## **COMPLAINT**

COMES NOW, Plaintiff Paul M. Emmer and asserts his claims against the Defendants, stating the following:

## SYNOPSIS OF THE CASE

Plaintiff Emmer brings this civil action against the Defendants, asserting causes of action for: (i) breach of contract; (ii) fraudulent inducement; (iii) *quantum meruit*; (iv) unjust enrichment; (v) misappropriation; and (vi) judicial accounting. These claims arise from Defendants' failure and refusal to compensate Mr. Emmer for generating millions of dollars of corporate gross sales revenue from the sale of Personal Protective Equipment products.  Mr. Emmer demands principal damages

of not less than $4,951,000.00 together with attorney's fees and expenses, prejudgment interest and exemplary damages.

## PARTIES, JURISDICTION AND VENUE

### 1.

At all times relevant herein, Paul M. Emmer ("Emmer") has resided in Fulton County, Georgia lying within this federal district and division.

### 2.

Defendant WABII Branding Inc. ("WABII") is a corporation that was organized on May 31, 2019, exists pursuant to the Canada Business Corporations Act (CBCA, Section 263) and is domiciled in the Province of Ontario. It maintains its Registered Office at 100 University Avenue, 5th Floor, Toronto, Ontario, M5J 1V6, where the Complaint and summons herein may be served upon any of its board of directors, as named below. WABII conducts business operations and generates sales of its merchandise through several offices in the United States, including offices situated at 1372 Peachtree Street, NE, Atlanta, Fulton County, Georgia and another one situated in the northern perimeter area of metropolitan Atlanta, said offices being situated in this federal judicial district and division. Along with its co-Defendants, WABII has injured and damaged Emmer, as herein alleged. The Complaint and summons herein may be perfected upon WABII pursuant to the

Federal Rules of Civil Procedure, Rule 4(f)(1) via any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents.

3.

Defendant Jeremy Shane Rich ("Rich") is an individual residing in the Province of Ontario, Canada at 465 Nautical Boulevard, Oakville, Ontario L6L 0E8 where he may be served with the Complaint and summons herein. At all times relevant herein, Rich has served as WABII's Vice-President of Sales and Marketing, a member of its Board of Directors and is one of WABII's four shareholders. Along with his co-Defendants, Rich has injured and damaged Emmer, as herein alleged. The Complaint and summons herein may be perfected upon Rich pursuant to the Federal Rules of Civil Procedure, Rule 4(f)(1) via any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents and/or under Federal Rules of Civil Procedure, Rule 4(f)(2)(A) or Rule 4(f)(2)(C)(i).

02092164-7

4.

Defendant Grant Gilliard ("Gilliard") is an individual who resides in Canada and who also resides at 619 12th Street, Huntington Beach, Orange County, California 92648 where he may be served with the Complaint and summons herein. At all times relevant herein, Gilliard has been one of WABII's four shareholders. Gilliard also serves as President of AZTEX Enterprises Ltd. ("AZX").  At all relevant times herein, AZX and WABII have been sister corporations under common management and control by the personal Defendants and/or their spouses. Gilliard's spouse Lauri Puppa serves as a Director of AZX and a Director of WABII. Along with his co-Defendants, Gilliard has injured and damaged Emmer, as herein alleged. The Complaint and summons herein may be perfected upon Gilliard in Canada pursuant to the Federal Rules of Civil Procedure, Rule 4(f)(1) via any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents and/or under Federal Rules of Civil Procedure, Rule 4(f)(2(A) or Rule 4(f)(2)(C)(i).  Service may also be perfected  upon Gilliard in the State of California pursuant to the modes of service prescribed by Federal Rules of Civil Procedure, Rule 4(e) for service on individuals residing in other federal judicial circuits.

4

5.

Defendant Robert Kerton ("Kerton") is an individual understood to be residing in the Province of Ontario, Canada. Kerton may be served with the Complaint and summons herein at 5155 Fairview Street, Burlington, ON L7L 0J8, Canada. At all times relevant herein, Kerton has been an AZX shareholder and has served on its Board of Directors. Kerton's spouse, Andrea Cherniack, is a WABII shareholder and serves on its Board of Directors. Along with his co-Defendants, Kerton has injured and damaged Emmer, as herein alleged. The Complaint and summons herein may be perfected upon said Defendant pursuant to the Federal Rules of Civil Procedure, Rule 4(f)(1) via any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents and/or under Federal Rules of Civil Procedure, Rule 4(f)(2(A) or Rule 4(f)(2)(C)(i).

6.

Defendant Edward Scott ("Scott) is an individual residing at 4435 Holm Oak Lane, North Saint Paul, Ramsey County, Minnesota 55128 where he may be served with the Complaint and summons herein pursuant to modes of service prescribed Federal Rules of Civil Procedure, Rule 4(e) for service on individuals residing in other federal judicial circuits. At certain times relevant herein, Scott has served as

02092164-7

AZX's Vice-President of Sales. Currently, Scott serves as WABII's Chief Operating Officer. Scott's spouse Stacie Livingston is a WABII shareholder and serves on its Board of Directors. Along with his co-Defendants, Scott has injured and damaged Emmer, as herein alleged.

7.

Pursuant to 28 U.S.C. §1332, this Court has jurisdiction because diversity of citizenship exists between Emmer and each of the Defendants and the principal amount in controversy herein exceeds 75,000.00 exclusive of interest and costs.

8.

Venue in this federal district and division is proper pursuant to 28 U.S.C. § 1391(c) because the Defendants have sufficient minimum contacts with the State of Georgia by having *inter alia*: (i) availed themselves of business marketing and solicitation in, merchandise orders from and revenue derived from sales activities purposely conducted in and through the State of Georgia; (ii) procuring and maintaining physical office spaces in Georgia; (iii) hiring Emmer as a business sourcing and compliance director in Georgia; (iv) generating leads and introductions from offices in Georgia; and (v) by engaging in tortious conduct that has damaged the Emmer, a resident of this federal district and division. The Court has personal jurisdiction over the Defendants pursuant to the Georgia long-arm statute, O.C.G.A.

6

§ 9-10-91.  Assertion of personal jurisdiction over these Defendants by reason of their minimum contacts with this forum does not violate the Due Process Clause of the Fourteenth Amendment nor offend traditional notions of fair play and substantial justice.

FACTUAL BACKGROUND

9.

Emmer is a marketing executive. Over time, he has developed substantial skill and experience across major business sectors. He has a large  customer and vendor relationship base with purchasing personnel in public and private companies throughout the United States.  Before the onset of the COVID-19 pandemic, Emmer did not offer, market, sell, distribute or otherwise conduct business involving Personal Protective Equipment products ("PPE").

10.

Before the 2020 COVID-19 pandemic, WABII focused its business on retail merchandising, branding and distribution services world-wide. Those business activities did not include PPE.

11.

Before 2020, Emmer and Rich became acquainted through business dealings that were unrelated to WABII and PPE.

7

12.

As the COVID-19 pandemic spread, Rich contacted Emmer out of the blue in March 2020. Rich stated that WABII wished to exploit the commercial opportunities then existing, to market and distribute PPE. He asked Emmer to help WABII develop that new opportunity by soliciting and referring Emmer's business contacts to WABII for PPE purchases.

13.

Rich enticed Emmer, saying Emmer could greatly help WABII grow its PPE line and, correspondingly, earn substantial commissions for introducing businesses that critically needed PPE products as the pandemic rapidly spread. Specifically, Rich told Emmer that he would only need to refer business, introductions and contacts after which Rich, the other personal Defendants and WABII would handle the rest. Emmer would provide the Defendants with names, emails, contacts and introductions; and he would not be involved with WABII operationally.

14.

Emmer's and Rich's discussions ultimately resulted in a joint commission arrangement. They agreed that Emmer would provide to WABII, business introductions and corporate contact information leads. Using those, WABII would develop prospective PPE purchasers.

8

15.

On April 1, 2020, Rich and Emmer started discussing Emmer's commission arrangement for his services. Initially, Rich proposed a commission arrangement of based on a percentage of WABII's *gross profit* on each PPE order resulting from an Emmer introduction or contact.

16.

Emmer promptly declined that gross profit proposal. He emphasized he did not desire to be subjected to, become involved in, monitor or manage WABII's internal business costs, operating costs and other expenses and offsets that WABII would apply in reducing gross sales revenue to gross profit, namely, subtracting its cost-of-sales and cost-of-goods-sold on Emmer-generated PPE gross sales revenue.

17.

Emmer countered with a payment structure that would insulate him from potential future accounting disputes with WABII over the reasonableness of its internal costs or whether certain of its costs should be excluded from "cost-of-sales" and "cost-of-goods-sold" calculations. He required a commission of twenty percent (20%) of the *gross sales revenue* WABII would receive on each order resulting from Emmer's introductions and leads.

02092164-7

18.

Rich accepted Emmer's counterproposal of twenty percent of gross sales revenue.  He then presented it to Scott, Kerton and Gillard. On April 8, 2020, Rich notified Emmer that Scott, Kerton and Gillard also accepted Emmer's counterproposal and that they had a deal (hereafter, the "Commission Agreement"). From that date forward until September 2020, Scott served as AZX's Vice-President of Sales and emailed Emmer and the remaining parties via AZX's email server.

19.

The personal Defendants advised Emmer that Scott would be participating in WABII's launch of PPE products as WABII's Chief Operating Officer. Emmer also observed that while Scott was employed at AZX (where Scott's  spouse was a shareholder and director), Scott was continually overseeing WABII's operations. Five months after actively working for WABII, Emmer received his first "WABII"-generated email from Scott.

20.

The Defendants did not reduce the Commission Agreement to a written, executed contract. Even so, WABII's management confirmed the Commission Agreement in subsequent communications with Emmer.

02092164-7

21.

On April 20, 2020, WABII received its first order through Emmer's efforts in Georgia. WABII assigned Emmer the title of "Senior Director-Sourcing and Compliance." Emmer conducted those services from within this federal district and division.

22.

WABII has used "WeWorks" facilities in Fulton and DeKalb County, Georgia to establish its physical presence in Georgia. On or about July 10, 2020, WABII provided Emmer with a WeWorks membership in Atlanta. Over time, Emmer then worked at WABII's WeWorks facility at the Terminus Building in Atlanta's Buckhead section,  and at a WABII office at the WeWorks facility at 1155 Perimeter Center West in Dunwoody, Georgia.

23.

WABII's current website also displays a facility at 1372 Peachtree Street, N.E., Atlanta, Georgia as one of its several U.S.-based offices.  The website refers to that location as the "Atlanta Office" *See* true and correct excerpts of https://wabiibranding.com/where-are-we/, attached hereto and expressly incorporated herein as **Exhibit A**.

02092164-7

24.

Emmer's services and efforts for WABII between April and December, 2020 were extraordinarily successful. WABII's limited accounting information and calculations provided to him reflect that Emmer's direct introductions and leads generated $23,895,000.00 in PPE gross sales revenue in those nine months. That sum represented over eighty-five percent (85%) of WABII's 2020 gross sales revenue from PPE sales.

25.

On or about late August 2020 and without advanced discussion, Scott emailed Emmer through AZX's email server.  Scott stated that WABII planned to convert the Commission Agreement to a sliding scale commission based on WABII's profit margin. Pursuant to that "plan," Emmer would receive anywhere from a five percent (5%) to a twenty (20%) commission based on five percent interval bumps.

26.

From that point forward, the personal Defendants became increasingly less conversant with and responsive to Emmer. WABII, acting through Rich and Scott, began providing Emmer less frequent and less substantive sales and accounting information.  Emmer needed that data to verify that WABII was accurately crediting him on completed sales and paying him pursuant to the Commission Agreement.

02092164-7

Increasingly, Rich and Scott reduced their communications with Emmer. Increasingly, Emmer was not getting his commission questions answered and rectified.  As the parties entered the last quarter of 2020, Defendants had been habitually paying Emmer partial commission payments against an ever-increasing, substantial unpaid commission accrual.

27.

Emmer again followed up with Scott on December 21, 2020 about missing PPE sales orders that Scott had failed to credit to him and to rectify. On December 26, 2020, Scott provided some limited sales reporting data to Emmer. That data lacked meaningful supporting accounting records to satisfy Emmer. Emmer advised Scott that the data failed to include approximately eleven of Emmer's sales between April and November.

28.

During 2020, WABII paid Emmer several partial installments totaling $1,250,000.00 against his 2020 accrued commissions while the parties attempted to resolve the internal accounting records and PPE orders pursuant to Emmer's ongoing requests. Those installments were substantially less than commissions of twenty percent on nearly $24 million in gross sales revenue that Emmer developed for WABII.   Unbeknownst to Emmer, WABII's owners and executives were

intentionally stalling his commissions while he continued to generate huge sales. From the date Rich first solicited Emmer's participation, no Defendant ever intended to pay him pursuant to the Commission Agreement.

29.

Scott's communication about potential modification of the Commission Agreement surprised Emmer. First, WABII still owed him huge 2020 commissions on concluded orders, and he was still adding more sales to WABII's pipeline as year-end approached. Second, through December 9, 2020, WABII had received nearly $23.9 million in gross revenue from Emmer's sales generation. Third, the Defendants knew back to April 2020, that Emmer had declined a commission based on gross profit because he would have no control over WABII's costs of goods sold or its cost of sales.

30.

On December 28, 2020, Emmer responded again to Scott's calculation of orders and the commissions due to him. Emmer advised Scott that Scott had improperly deducted overhead, an internal company commission cost and other internal WABII costs from Emmer's then-currently due commissions.  He advised Scott that those deductions were never discussed with him and that he did not approve them. Even so, Emmer wanted to make his overall relationship with WABII

14

mutually productive. Reserving his contractual rights under the Commission Agreement, Emmer said he was willing to explore a different going forward arrangement provided it was mutually fair to everyone.

31.

Emmer continued driving WABII's sales well into 2021 while trying to understand and resolve WABII's calculations of his unpaid 2020 commissions.

32.

Meanwhile, the personal Defendants caused WABII to withhold timely and full payment of 2020 commissions due to Emmer and to drag out paying him under the guise of creating commission calculation issues. For example, the personal Defendants disbursed the following WABII partial payments to him against his accrued, then unpaid 2020 commissions: $499,990.00 in January 2021; $249,990.00 in February 2021; $249,990.00 in March 2021; and $249,990.00 in April 2021. Defendants told Emmer that WABII was making those payments "in [alleged] good faith." Those January through April 2021 partial commission payments were not paid pursuant to the Commission Agreement. The Defendants each disregarded the Commission Agreement.

02092164-7

33.

After going silent on Emmer in December 2020, Rich emailed Emmer about the unpaid commission situation *six months later* on May 6, 2021. Therein, Rich discussed WABII's alleged high operating costs and alleged limited profitability from selling PPE products,  due to alleged increasing costs, its increased labor, accounting and order sourcing, logistical, and other facilitation costs and selling expenses.

34.

Rich asserted that WABII had mobilized and was paying  AZX for alleged additional labor support on its supply line, to liaise with WABII's vendors, for AZX's technology team to manage WABII's mushrooming purchase orders and credit card payments and for more accounting personnel to sort out charges WABII incurred by using AZX's freight and brokerage accounts.

35.

Rich also claimed that those charges and costs further reduced WABII's profitability. Rich refused to support his statements to Emmer with corporate financial statements and related source documents. Simply put, Rich was complaining that Emmer's one-year generation of $23,895,000.00-plus in startup PPE gross sales was just too much success for WABII.

36.

During Rich's May 2021 communications with Emmer, the Commission Agreement remained in effect, as it does to this day. It has not been mutually terminated, waived, compromised or superseded.  Rich himself has acknowledged its enforceability to Emmer.

37.

Rich for himself, Scott, Gilliard and Kerton, told Emmer that Emmer was making more money than they were as WABII's owners. He demanded that Emmer would have to agree to a sliding scale ". . . payout [that] is dynamic and profit based."

38.

Rich further told Emmer that Defendants' proposed unilateral commission adjustment would be applied retroactively to Emmer's accrued, unpaid 2020 commissions and paid in the following installments *only after a signed agreement was in place*:

      (i)     May 15th [2021] -- $250,000.00;

      (ii)    June 15th [2021] -- $250,000.00; and

      (iii)   July 15th [2021] -- $281,091.64.

02092164-7

39.

On receiving the foregoing communications, Emmer asked Rich to provide him applicable WABII accounting and financial records so he could understand and verify the purported expenses and costs that allegedly were reducing WABII's profitability. Rich rejected that request by claiming corporate "confidentiality" grounds. By doing so, Rich, Scott, Gilliard and Kerton further blockaded Emmer's ability to evaluate the factors Rich cited as the alleged causes of WABII's claimed lack of profitability.

40.

Emmer told Rich that since he is not a WABII shareholder and does not control its operations, WABII's alleged high costs of doing business should not be allocated to him on any proposed sliding scale basis.  Emmer also stated that any potential *mutually agreed upon* commission modification that might be negotiated should only operate prospectively to future, not past, orders.

41.

As of the filing of this Complaint, WABII continues to withhold Emmer's earned commission payments. It refuses to pay those to him unless and until he agrees to WABII's mandated new commission structure pursuant to a signed written agreement. WABII also intends to apply Defendants' demanded new commission

02092164-7

structure retroactively to Emmer's unpaid compensation on orders attributable to him and booked from March 20, 2020 through this date.

<u>COUNT I</u>
(Breach of Contract Claim Against WABII)

42.

Emmer incorporates Paragraphs 1 through 41 hereinabove as if the same were fully alleged hereafter.

43.

Emmer has complied with his obligations under the Commission Agreement. He has substantially performed those obligations to WABII's material benefit and remuneration and to his material detriment through uncollected commissions.

44.

WABII has materially and continuously breached the Commission Agreement. Said breach has not been excused or waived.

45.

Said breach of the Commission Agreement has denied Emmer the consideration and compensation to which he is entitled and for the benefit of his bargain, having performed his services to-date.

02092164-7

46.

WABII owes Emmer accrued, unpaid commissions in such sums as shall be hereafter determined and proven but in no event less than $4,951,000.00.

47.

WABII has acted in bad faith, has been stubbornly litigious and has caused Emmer unnecessary trouble and expense, entitling him to an award of attorney's fees and expenses pursuant to O.C.G.A. § 13-6-11.

## COUNT II
(Fraudulent Inducement Claim Against all Defendants)

48.

Emmer incorporates Paragraphs 1 through 41 hereinabove as if the same were fully alleged hereafter.

49.

WABII is a closely held corporation. Rich, Scott, Gilliard and Kerton each participates in its operations and decision-making and controls its business dealings.

50.

Since early 2020, each of the personal Defendants has been materially involved in expanding WABII's operations to include the profitable marketing and sale of PPE products.

51.

Defendants knew that by sharing his business leads and relationships with them, Emmer would materially enhance and accelerate WABII's marketing of PPE products during a period of critical high demand and short supply thereof. During Rich's early commission negotiations with Emmer, the personal Defendants knew that Emmer flatly rejected any commission arrangement that would be tied to and determined by WABII's profitability. Emmer was clear with Rich that since he would have no control over WABII's operating and sales costs, he could not accept the profits-based commission arrangement Rich and his co-Defendants had initially offered.

52.

Emmer reasonably and justifiably trusted the personal Defendants' confirmation of the arrangement and began work.

53.

When WABII accepted the Commission Agreement, Scott, Rich, Gilliard and Kerton each had the then present intent to: (i) abandon that agreement and (ii) force Emmer into a commission arrangement tied to WABII's profitability. At all relevant times, the Defendants evaluated, decided upon and implemented WABII's PPE operations. They knew about WABII's projected supply line costs, order

02092164-7

implementation costs and other expenses that impact procurement and distribution

of merchandise. Indeed, procuring and distributing merchandise to purchasers is

WABII's historical business that it proudly boasts on its website.

54.

At no time did Emmer have control of or ask for involvement in overseeing

and managing WABII's expenses and infrastructure costs for its PPE product

distribution. Emmer's job was to share his leads with and make introductions for the

Defendants. Indeed, the personal Defendants subsequently accused Emmer of

"making too much money" while they claimed to be making very little.

55.

The Defendants have intentionally concealed material accounting records

from Emmer, which affect the computation of his commissions. Emmer fears that

the Defendants have falsified WABII's accounting records to distort its sales

revenues and profitability and for the purpose of arguing alleged "justification" to

reduce his commissions due in order to damage him.

56.

Due to the common direct and indirect ownership and management of WABII

and AZX, as described in Paragraphs 4, 5 and 6 above,  Emmer rationally fears that

the Defendants are unlawfully engaging in accounting misclassification of costs of

22

goods sold and overhead payments for AZX's alleged services, to the personal Defendants' gain while they strip WABII's available working capital that would pay his accrued, unpaid commissions.

57.

When they accepted Emmer's Commission Agreement, the Defendants also had the then present intent to dishonor the agreement over time. They implemented their intent by paying Emmer's commissions irregularly, partially, without full supporting backup and without regard to the Commission Agreement's terms. Their intent was to see how well Emmer generated sales; to drag WABII's commission payments to him while he continued performing in good faith; and ultimately, to financially crush him by forcing him (i) to agree to a retroactive and a prospective reduced commission rate, or, (ii) to walk away and forfeit his unpaid commissions.

58.

Through their conduct and scheme, Defendants fraudulently induced Emmer to enter into the Commission Agreement thus resulting in him sharing with WABII his lucrative introductions and sales leads that he has worked years to develop.

59.

The Defendants concealed their fraudulent intent, plans and transactions from Emmer when they induced him to contract with WABII. He reasonably and

justifiably relied on their misrepresentations to him. He did not have the reasonable means available to discover the falsity of their representations or the existence of any of their concealed material matters. He relied reasonably upon and trusted Rich based on their past business dealings.

60.

The Defendants have acted with fraud and deceit toward Emmer to their benefit and to his resulting loss and damage in an amount of not less than $4,951,000.00.

61.

Each Defendant has acted in bad faith, has been stubbornly litigious and has caused Emmer unnecessary trouble and expense, entitling him to an award of attorney's fees and expenses of litigation pursuant to O.C.G.A. § 13-6-1.

62.

Each Defendant has acted maliciously and with conscious indifference toward Emmer with the intent to cause him harm. He is entitled to recover a separate judgment for exemplary damages against each Defendant pursuant to O.C.G.A. § 51-12-5.1 as the jury in its enlightened conscience shall determine but in no event less than $2,000,000 per Defendant.

02092164-7

<u>COUNT III</u>
(*Quantum Meruit* Claim Against WABII)

63.

Emmer incorporates Paragraphs 1 through 41 hereinabove as if said allegations were fully set forth herein.

64.

Emmer has provided valuable services, introductions and leads to WABII.

65.

WABII's management was attracted to Emmer because of his well-established corporate connections and relationships throughout the United States. Emmer has devoted many years developing and maintaining those connections.

66.

Given WABII's immediate need for services in order to commercially exploit the PPE market, its fresh entry into the PPE product sector and the demand of prospective purchasers, the reasonable and recognized value of Emmer's services to WABII is not less than twenty percent (20%) of all gross sales revenue WABII has received from Emmer's efforts.

67.

Emmer is entitled to recovery to recover a judgment in *quantum meruit* from

WABII in the sum of not less than $4,951,000.00.

68.

WABII has acted in bad faith, has been stubbornly litigious and has caused Emmer unnecessary trouble and expense, entitling him to an award of attorney's fees and expenses of litigation pursuant to O.C.G.A. § 13-6-1.

COUNT IV
(Unjust Enrichment Against All Defendants)

69.

Emmer incorporates Paragraphs 1 through 41 and 49 through 62 hereinabove as if said allegations were fully set forth herein.

70.

WABII and its co-Defendants have received and retained monies otherwise due and payable to Emmer. In equity and good conscience, said Defendants are not entitled to retain said monies. They must be judicially compelled to disgorge said monies.

71.

The Defendants have unjustly enriched themselves at Emmer's expense in the sum of not less than $4,951,000.00.

02092164-7

72.

The Defendants have acted in bad faith, have been stubbornly litigious and have caused Emmer unnecessary trouble and expense, entitling him to an award of attorney's fees and litigation expenses pursuant to O.C.G.A. § 13-6-11.

<u>COUNT V</u>
(Misappropriation Claim Against All Defendants)

73.

Emmer incorporates Paragraphs 1 through 72 hereinabove as if said allegations were fully set forth herein.

74.

Defendants have wrongfully taken control of, diverted, misappropriated and converted from Emmer, his earned commissions to their benefit and gain without accounting for his legal interest therein. They are depriving him of his legal right and interest in said property.

75.

Defendants have engaged in that misconduct to obstruct and bar Emmer from receiving his earned compensation.

76.

Each Defendant has knowingly orchestrated that unlawful conduct. Each

02092164-7

Defendant has personally received, and has enabled each other to receive, a direct or indirect interest in the misappropriated, converted commissions without accounting for Emmer's legal interest in those funds.

77.

None of the Defendants has repaid or otherwise made restitution to Emmer for the misappropriated and converted commissions due to Emmer, said restitution being in an amount of at least $4,951,000.00.

78.

The Defendants have engaged in subterfuge, falsity, breach of promise, non-disclosure and other wrongdoing to conceal, retain or purport to "justify" their illegal misappropriations.

79.

Each Defendant has acted in bad faith, has been stubbornly litigious and has caused Emmer unnecessary trouble and expense, entitling him to an award of attorney's fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

80.

Each Defendant has acted maliciously and with conscious indifference toward Emmer with the intent to cause him harm. He is entitled to recover a separate judgment for exemplary damages against each Defendant pursuant to O.C.G.A. §

02092164-7

51-12-5.1 as the jury in its enlightened conscience shall determine but in no event less than $2,500,000 per Defendant.

<u>COUNT VI</u>
(Judicial Accounting Against WABII and Its Affiliates)

81.

Emmer incorporates Paragraphs 1 through 80 hereinabove as if said allegations were fully set forth herein.

82.

As previously alleged, Defendants have deprived Emmer of necessary accounting and sales records along with financial records reflecting WABII's receipts from and disbursements to third parties and/or to the personal Defendants and/or to AZX. WABII claims that said records purportedly justify not paying Emmer his earned commissions. Emmer is entitled to have financial forensic experts review said records and their underlying source documents and report their findings and conclusions to the Court.

83.

This proceeding also demands an accurate determination of the amounts of monies that any of the Defendants have transferred to themselves, their family members and/or to their affiliated entities in an effort to: (i) distort or manipulate

WABII's financial condition to Emmer's pecuniary loss; (ii) delay and obstruct Emmer's recovery of commissions due to him; and/or (iii) benefit themselves from improper distributions and transfers to Emmer's loss and damage as a creditor of WABII.

84.

Emmer requests that the Court order an immediate independent forensic review and accounting from January 1, 2020 forward of WABII's and its affiliates' respective: (i) accounting books and records; (ii) banking records; (iii) disbursements to officers and shareholders; and (iv) other relevant third-party transactions, as the foregoing information relates to, is in connection or affects WABII's PPE business since that date. Said review and accounting are necessary and justified in this proceeding to identify, verify, document, trace, and value all transactions and dealings of the Defendants whereby they may have altered, distorted or manipulated WABII's financial condition, directly and indirectly, for their personal benefit and/or to Emmer's disadvantage and loss (the "Judicial Accounting").

85.

Emmer further requests that the Court appoint qualified independent certified public accountants having business auditing and forensic accounting experience (i)

to interview the Defendants; (ii) to perform said Judicial Accounting; and (iii) to deliver their report of findings and conclusions from the Judicial Accounting to the Court and to all counsel of record herein.

86.

Emmer further requests that the Court tax the costs of said Judicial Accounting upon the Defendants, jointly and severally.

**WHEREFORE,** Plaintiff prays:

(A)    That as to Count I, Breach of Contract, the Court award Emmer a judgment against Defendant WABII for damages in such sums as shall be hereafter proven (but not less than $4,951,000.00) together with prejudgment interest thereon, attorney's fees and expenses of litigation and costs;

(B)    That as to Count II, Fraudulent Inducement, the Court award Emmer a judgment, jointly and severally, against all Defendants for damages in such sums as shall be hereafter proven (but not less than $4,951,000.00) together with prejudgment interest thereon, attorney's fees and expenses of litigation, exemplary damages and costs;

(C)    That as to Count III, Quantum Meruit, the Court award Emmer a judgment against Defendant WABII for damages in such sums as shall be hereafter

31

proven (but not less than $4,951,000.00) together with prejudgment interest thereon, attorney's fees and expenses of litigation and costs;

(D)    That as to Count IV, Unjust Enrichment, the Court award Emmer a judgment against all Defendants, jointly and severally, for damages in such sums as shall be hereafter proven (but not less than $4,951,000.00) together with prejudgment interest thereon, attorney's fees and expenses of litigation and costs;

(E)    That as to Count V, Misappropriation, the Court award Emmer a judgment against all Defendants, jointly and severally, for damages in such sums as shall be hereafter proven (but not less than $4,951,000.00) together with prejudgment interest thereon, attorney's fees and expenses of litigation, exemplary damages and costs;

(F)    That as to Count VI, Judicial Accounting, the Court order said independent forensic accountings, as prayed, of WABII and its affiliates; order each of the Defendants to cooperate fully in said accounting; and order each of the Defendants to pay for the costs thereof, jointly and severally;

(G)    That the Court issue such other and further relief to Emmer as is just, proper and equitable; and

(H)    That Emmer have a trial by jury upon all issues so triable herein.

02092164-7

Respectfully submitted, this 18th day of August, 2021.

By: ___ /s/ Gerald B. Kline _____
      Gerald B. Kline
      Georgia State Bar No. 425175
      gkline@taylorenglish.com
      Henry M. Quillian III
      Georgia State Bar No. 003160
      hquillian@taylorenglish.com

      Counsel for Plaintiff Paul M. Emmer

TAYOR ENGLISH DUMA, LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia  30339
(770) 434-6868 (Main)
(678) 336-7176 (Direct)

33

# EXHIBIT A

HOME   WHO ARE WE   PRODUCTS ⌄   REACH   WHERE ARE WE   ENGAGE

On Brand  On Trend  On Time

wabiibranding.com/where-are-we/?doing_we...

Apps · Paycom · ShareFile · Planning Center Ser... · re:SearchGA · Yahoo Mail · Delta Community C... · Choir Directory · Emory · AmeriHome Refina... · Zoom · Proof · Rea

## Atlanta Office

1372 Peachtree St NE
Atlanta GA
30309

**EMAIL GA OFFICE**





1372 Peachtree...
View larger map

Ascent Midtown Apartments

Theater

1372 Peachtree St
Atlanta, GA 30309

MODA

High Museum of Art

The Woodruff Arts Center

Google

enter   Keyboard shortcuts   Map Data   Terms of Use

## LA Office

925 N La Brea Ave, 4th Floor
Los Angeles, CA
90038

**EMAIL CA OFFICE**





## NYC Office

1619 Broadway

NY, NY

10019

**EMAIL NY OFFICE**





## Miami Office

117 NE 1st Ave
Miami, FL
33132

EMAIL FL OFFICE







**On Brand  On Trend  On Time**

HOME   WHO ARE WE   PRODUCTS ⌄   REACH   WHERE ARE WE   ENGAGE

## NEW

### ACCESSORIES

AUTOMOTIVE
FLASHLIGHTS
GIFT SETS
GOLF
KEYCHAINS
LUGGAGE TAGS
MISC
SUNGLASSES
TOOLS
TRAVEL
PETS

### DRINKWARE

BOTTLES
MUGS
TUMBLERS

## BAGS

BACKPACKS
BRIEFS
CASES
DUFFELS
TOTES

## ECO

DRINKWARE
BAGS
MISC
NOTEBOOKS
TECH
REUSABLE STRAWS
ECO PEN

## TECH

CHARGERS
CHARGING CHORDS
MOBILE
RFID
SPEAKERS
EARPHONES
MISC

## PPE

## PENS

## HEALTH & WELLNESS

## HOME

## NOTEBOOKS

## FASHION

FASHION ECO
HEADWEAR
HOODIES
JACKETS
T'S
SWEATSHIRTS
PANTS



# Who Are We

Wabii Branding exists to boost the appeal of your companies' brand, by-way of the exquisite selection, design and distribution of relevant, cutting-edge product.

Be it promotional product (swag), retail brands (merch), branded apparel and uniforms (fashion), Wabii delivers on-trend ideas tailored to client need and budget.

We offer a diverse assortment of services ranging from same-day, customized product production to the design, creation and maintenance of full-service e-commerce company store platforms.

Boasting a broad base of international clientele, spanning multiple industries with locations worldwide, Wabii is only a call, email or office visit away.
We are stoked to meet and work with you!